## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF CONNECTICUT
## HARTFORD DIVISION

| | | |
|---|---|---|
| IN RE: | : | CASE NO. 13-51186 (JJT) |
| JIE XIAO | : | |
|     Debtor | : | CHAPTER 7 |
| RONALD I. CHORCHES, TRUSTEE | : | |
|     Movant | : | RE: ECF Nos. 458, 475 |
| v. | : | |
| JIE XIAO | : | |
|     Respondent | : | |

## POST TRIAL RULING ON CLAIMED PENSION EXEMPTION

### I.    INTRODUCTION

Before the Court is the Chapter 7 Trustee's Objection to the Debtor's Claim of

Exemptions ("Objection", ECF No. 475). Therein, the Chapter 7 Trustee, Ronald Chorches

("Trustee") objects to the claimed exemption of funds by the Debtor, Jie "George" Xiao ("Mr.

Xiao" or "Debtor") in the LXEng, LLC ("LXEng") Pension Plan ("Plan") valued in the amount

of $414,533.40. While initially claimed as an exemption under 11 U.S.C. § 522(d)(10),[1] the

Court tried this case based upon the Debtor's belated amendment of the exemption (ECF No.

458) pursuant to 11 U.S.C. § 522(d)(12). The gravamen of this matter concerns the Bankruptcy

Code's exemption for certain tax-exempt retirement funds. For the reasons stated herein, the

Objection is SUSTAINED.

### II.    PROCEDURAL HISTORY

On July 30, 2013 ("Petition Date"), the Debtor commenced this proceeding by filing a

voluntary petition for relief under Chapter 7 of the Bankruptcy Code. The Debtor claimed an

ownership interest in all of the assets of the Plan on his Amended Schedule B (ECF No. 27),

---

[1] Unless otherwise noted, all future statutory references are to Title 11 of the United States Code, sometimes referred to as the "Bankruptcy Code" or "Section ____".

having a value of $412,533.40 as of the Petition Date, and disclosed a 100% interest in LXEng

on his Amended Schedule B, having a value of $0.00. The Debtor claimed an exemption in all of

the assets of the Plan pursuant to 11 U.S.C. § 522(d)(l0)(E). The Debtor's Schedules reveal that

he also claimed exemptions in other assets, including four different pension plans, which have

gone unchallenged. The Debtor's Schedules further reveal nearly $1 million in general unsecured

debt, plus disputed and unliquidated litigation claims by Dow Corning Corp. and its affiliate.

On November 20, 2014, the Trustee filed the Objection to the Plan exemption (ECF No.

271). After no response from the Debtor for almost two years, on July 29, 2016, the Trustee filed

a Motion for Summary Judgment on the Objection (ECF No. 393). On September 29, 2016, the

Debtor filed a Response, an Opposition Brief, an Affidavit in Opposition, a Local Rule 56(a)(2)

Statement, and a Response to the Trustee's Objection to the Debtor's exemption (ECF Nos. 397,

398, 399, 400, 401). The Court issued a scheduling order setting deadlines for discovery to be

completed within sixty days and directing the Debtor to file monthly reports on the Plan (ECF

No. 410).

On November 15, 2016, the Trustee filed a Motion for a Stand-Still Order Regarding the

Plan Assets (ECF No. 413), to which the Debtor objected (ECF No. 415). The Court issued a

Memorandum of Decision granting the Trustee's Motion for Stand-Still Order on December 1,

2016 (ECF No. 423). On December 13, 2016, the Debtor requested an extension of time to

complete discovery and submit an expert report (ECF No. 427). The Court granted his request,

and set further deadlines for discovery (ECF No. 440).

On January 27, 2017, the Debtor filed a Supplemental Document in Opposition to the

Trustee's Motion for Summary Judgment (ECF No. 445), accompanied by an amended Local

Rule 52(a)(2) Statement (ECF No. 447) and a Memorandum of Law in Opposition to the

2

Trustee's Motion for Summary Judgment written by the Debtor's expert (ECF No. 446). On

March 20, 2017, the Debtor amended his Schedule C to change the Plan's exemption from a

claim under 11 U.S.C. § 522(d)(10) to one under 11 U.S.C. § 522(d)(12) (ECF No. 458), to

which the Trustee later objected (ECF No. 475). The Trustee also filed a Reply to the Debtor's

Opposition to Summary Judgment (ECF No. 459) on March 20, 2017.

On May 25, 2017, the Court denied the Trustee's Summary Judgment Motion (ECF No.

510), finding a genuine dispute of material fact as to whether the Debtor was materially

responsible for the Plan's noncompliance, and reserving judgment on whether there were

additional facts in genuine dispute.  The parties subsequently submitted a joint pre-trial order

(ECF No. 516) on June 27, 2017 to advance the case to trial based upon the amended exception

claim.

On September 12 and 13, 2017, the Court held a two-day trial on the Objection. During

the course of the trial, the Court heard testimony from the Trustee, his expert, John V. Galiette,

Esq. ("Mr. Galiette"), Michael F. Ostuni ("Mr. Ostuni"), and Mr. Xiao. In rebuttal, the Debtor

advanced his own testimony and that of his expert Andrew J. Fair, Esq. ("Mr. Fair"), and Mr.

Ostuni.

Although the contest was vigorous, few of the facts advanced by the Trustee at trial were

successfully rebutted. Notably, Mr. Xiao's testimony was generally repetitive, self-serving, and

unconvincing. Thematically, he professed ignorance of the nature and consequence of the

professional advice he garnered to assist his company LXEng in the formation and

administration of the Plan, and professed his abdication of material decisions to advisors.  His

protestations of reliance upon the advisors notwithstanding, his credibility was strained, and his

testimony was conclusory, evasive and seemingly rehearsed. His recollection of certain events

also appeared to this Court to be selective in favor of those that served his interests. The effect

and calculus achieved by the decisions and modifications made to the Plan were, according to

Mr. Xiao's advisors, at his behest and at all times manifestly served to exclusively benefit Mr.

Xiao and his then wife, Xin Chen ("Ms. Chen").  In the end, his tortured, incomplete, and

contrived navigation of the Internal Revenue Code ("IRC")[2] compliance requirements for the

Plan in order to support his claimed exemption under 11 U.S.C. § 522(d)(12) fails for the reasons

articulated herein.

## III.    JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and derives

its authority to hear and determine this matter on reference from the District Court pursuant to 28

U.S.C. §§ 157(a) and (b)(1). This is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

## IV.    FINDINGS OF FACT[3]

In accordance with Fed. R. Civ. P. 52 and Fed. R. Bankr. P. 7052, after consideration of

the trial testimony and argument, the documents admitted into evidence, and examination of the

record of the trial, the Court finds the following facts.

### **Formation of LXEng and the Plan**

1.  Mr. Xiao and Ms. Chen were married in 1992, and they have two children together.  Jt. Stip.

Facts, ¶1.

---

[2] *See* 26 U.S.C. §§ 1–9602. For purposes of this opinion, future references to title 26 of the United States Code will
be cited as "I.R.C. Section ___".
[3] The Court's finding of the underlying facts is drawn from the following: the debtor's admissions in pleadings,
including the Joint Stipulation of Undisputed Facts and Exhibits (ECF Nos. 524, 533, 539) and the Debtor's Post
Trial Brief (ECF No. 543); trial exhibits; the docket of the bankruptcy case; and the record of the two day trial held
on September 12, 2017 (ECF No. 530) and September 13, 2017 (ECF No. 532). References to the audio record of
the trial will appear in the following format, respectively: Tr. 1, __, Tr. 2 at __. The parties submitted proposed
Findings of Fact and Conclusions of Law following the trial.

2.  Mr. Xiao has a bachelor's degree from Shanghai Jiao Tong University and received a Ph.D. in chemistry from the University of Michigan in 1996.  Jt. Stip. Facts, at ¶2.

3.  Mr. Xiao and Michael Little ("Mr. Little") formed LXEng in 2007.  Jt. Stip. Facts, at ¶3. LXEng was an engineering consulting company which sold technology packages and services to its clients. Tr. 1, 2:45; Tr. 2, 0:11–12.

4.  Mr. Xiao and Mr. Little were each initially 50% owners of LXEng.  Jt. Stip. Facts, ¶4. Mr. Little died in an airplane crash on November 3, 2007. Jt. Stip. Facts, ¶5.

5.  After Mr. Little's death, Ms. Chen was made a 10% owner of LXEng and Mr. Xiao took a 90% ownership of LXEng.  Jt. Stip. Facts, ¶6. Mr. Xiao became the managing member of LXEng.  Jt. Stip. Facts, ¶7.

6.  On December 15, 2007, the Plan was formed with an effective date retroactive to January 1, 2007.  Jt. Stip. Facts, ¶8.

7.  At the time of the Plan's adoption, Mr. Xiao owned 90% of LXEng and Ms. Chen owned 10% of LXEng.  Tr. 1, 1:51.

8.  The Plan was based on the MassMutual Life Insurance Company Prototype Standard Non-Integrated Defined Benefit Pension Plan.  Jt. Stip. Facts, ¶9.

9.  The co-trustees of the Plan were Mr. Xiao and Ms. Chen.  Jt. Stip. Facts, ¶¶ 10, 13.

10. Mr. Xiao signed the Plan on behalf of LXEng, the Employer and Administrator of the Plan. Jt. Stip. Facts, ¶12.

11. The Plan listed Keystone Healthcare, LLC ("Keystone"), as a "Participating Employer" under the Plan.  Jt. Stip. Facts, ¶11. Keystone was a consulting company that Mr. Xiao had previously established to provide certain consulting services in the pharmaceutical industry. Tr. 1, 2:45; Tr. 2, 0:11–12.

12. Mr. Xiao was the 100% owner of Keystone by, at the latest, July 30, 2013. Tr. 2, 0:04–07. Keystone was operated from Mr. Xiao's home.  Tr. 2, 0:08–09.

13. No business relationship existed between Keystone and LXEng other than that the Debtor owned both companies. Tr. 1, 2:45; Tr. 2, 0:11–12.

14. Mr. Xiao signed the Plan on behalf of Keystone as the Participating Employer.  Jt. Stip. Facts, ¶14.

15. Ms. Chen was never employed by Keystone.  Tr. 1, 2:48.

16. The Plan, as originally adopted in 2007, did not permit the use of life insurance policies to fund a death benefit. Tr. 1, 4:12; Ex. T1, at ¶33.

17. As of December 31, 2007, both Mr. Xiao and Ms. Chen were listed as "highly compensated employees" of LXEng.  Jt. Stip. Facts, ¶16.

18. For the calendar year 2007, LXEng reported to the Internal Revenue Service ("IRS") ordinary business income of $1,341.  Ex. T11.

19. As of December 31, 2008, Mr. Xiao and Ms. Chen were still listed as the only two participants in the Plan, and were each 20% vested under the six-year vesting schedule. Jt. Stip. Facts, ¶¶ 17, 18. They remained listed as "highly compensated employees" of LXEng. Jt. Stip. Facts, ¶19.

20. For the calendar year 2008, LXEng reported ordinary business income of $462,747 to the IRS. Ex. T12.

21. The IRS issued an opinion letter dated April 29, 2002, which related to the prototype plan adopted by LXEng. Tr. 2, 2:39–40; Ex. T1.

22. The IRS issued an opinion letter dated March 31, 2010, which related to the form of the Plan under the IRC. Tr. 1, 3:02; Ex. T3.

**LXEng's Professionals**

23. PenServ, Inc. ("PenServ") acted as the third-party administrator of the Plan.  Jt. Stip. Facts,
    ¶38.

24. A third-party administrator is a service provider that performs specific functions. A third-
    party administrator has no discretionary authority, unless it has specifically agreed to
    undertake fiduciary responsibility. Tr. 1, 1:52; 3:19–20.

25. Mr. Ostuni was the president and 100% owner of PenServ. Tr. 1, 0:34.

26. PenServ was not a fiduciary of the Plan and was unable to take any actions regarding the
    Plan without direction from LXEng, Mr. Xiao as the owner of LXEng, or LXEng's advisors
    Lloyd Cazes ("Mr. Cazes") and Michael Caputo ("Mr. Caputo"). Tr. 1, 0:38–39.

27. Mr. Cazes and Mr. Xiao had known each other for a long time. Tr. 2, 0:27. Mr. Cazes was
    the accountant for Mr. Xiao, LXEng, Keystone, and the vast majority of Mr. Xiao's other
    United States entities. Tr. 2, 0:27–28.

28. Mr. Cazes filed LXEng's 2007, 2008, 2009, and 2010 tax returns with the IRS at Mr. Xiao's
    direction. Tr. 2, 0:29–32; Exs. T11-14. Mr. Cazes held all of Mr. Xiao's, Keystone's, and
    LXEng's financial records for the years 2005–2013. Tr. 2, 0:32–33.

29. Mr. Caputo was retained by LXEng as a financial planner.  Tr. 2, 1:17.

30. Mr. Cazes and Mr. Caputo were, at all relevant times, agents of LXEng.  Tr. 2, 3:24.

**The First Discretionary Amendment**

31. Initially, the Plan required one year of service, meaning that the employee has completed at
    least 1,000 hours of service to LXEng, and attainment of age 21 to be eligible to participate
    in the Plan. Tr. 1, 0:48–49; Ex. T1, at ¶¶ 15, 18. The beginning date for any prospective
    participant in the Plan was the earlier of the first day of July or the first day of January

coinciding with or following the date on which the participant has met the requirements to participate in the Plan.  Ex. T1, at ¶16.

32. Plan participants would have their benefits vest over a six-year graded period, with 20% vesting after two years and each additional year resulting in an additional 20%. A year of service for vesting meant a twelve-month period beginning on an employee's date of employment or any anniversary of that date during which he or she completed at least 1,000 hours of service. Tr. 1, 0:48–50; Ex. T1, at ¶¶ 18, 34

33. As of December 31, 2007, there were only two participants in the Plan, Mr. Xiao and Ms. Chen.  Their dates of hire were listed as July 1, 2005. Jt. Stip. Facts, ¶15. Neither Mr. Xiao's nor Ms. Chen's benefits in the Plan had vested because they had not reached the two-year service requirement under the six-year graded vesting schedule. Ex. T7, at p. 5 (Employee Census).

34. The Plan was amended on March 1, 2009, effective retroactively to January 1, 2009 (the "2009 Amendment"). Jt. Stip. Facts, ¶20; Ex. T4. PenServ prepared the 2009 Amendment at the direction of LXEng. Tr. 1, 0:55. It was a discretionary amendment elected by LXEng. Tr. 1, 51.

35. Mr. Xiao signed the 2009 Amendment on behalf of LXEng, as the Employer and Administrator of the Plan, and with Ms. Chen, as co-trustee. Jt. Stip. Facts, ¶21.

36. As of January 1, 2009, when the 2009 Amendment went into effect, LXEng had eleven employees in addition to Mr. Xiao and Ms. Chen. Tr. 1, 2:10; Ex. T9, at p. 5 (Employee Census). At the time, the Plan's only participants were Mr. Xiao and Ms. Chen. Tr. 1, 0:53.

37. The 2009 Amendment excluded from Plan participation non-owner employees who were highly compensated employees. Tr. 1, 0:51–52, 2:19–21; Ex. T4. The 2009 Amendment also

increased the years of service to become eligible for participation from zero to two years and provided for 100% vesting immediately for all current Plan participants. Tr. 1, 0:51–52, 0:54, 2:19–21; Ex. T4.

38. The effect of the 2009 Amendment was to extend the participation requirement of the remaining employees of LXEng to two years. Tr. 1, 0:53–55.

39. Mr. Xiao and Ms. Chen became fully vested in the Plan as a result of the 2009 Amendment. Ex. T9, at p. 5 (Employee Census).

40. PenServ would never have advised LXEng, or any other client, to adopt an amendment similar to the 2009 Amendment. Tr. 1, 0:55.

### The Second Discretionary Amendment

41. During 2010, LXEng had between ten and fifteen employees, including Mr. Xiao and Ms. Chen. Tr. 2, 0:44–45.

42. On December 15, 2009, the Plan was amended effective as of January 1, 2010 ("2010 Amendment"). Jt. Stip. Facts, ¶24. The 2010 Amendment was also a discretionary amendment. Tr. 1, 0:51, 56.

43. The 2010 Amendment froze participation in the Plan against employees who were not already participants of the Plan as of January 1, 2010, as well as benefits accrual. Tr. 1, 0:56–57, 2:22–23; Ex. T5.

44. The practical effect of the 2010 Amendment was to exclude all then-present LXEng employees and any future LXEng employees from participating in the Plan and to prevent their accrual of benefits under the Plan, with the exceptions of Mr. Xiao and Ms. Chen. Tr. 1, 2:24–25.

45. The 2010 Amendment was offered to LXEng as an option by PenServ based upon information PenServ received from LXEng, Mr. Xiao, Mr. Cazes, and Mr. Caputo that adverse business conditions had arisen and allegations that the Plan had become too costly. Tr. 1, 0:57–1:01.

46. PenServ relied upon its clients to inform it of their business conditions. Tr. 1, 1:01.

47. LXEng's business was expanding and its taxable income was growing substantially from $462,747 in 2008 to $989,384 in 2009 to $1,601,481 in 2010. Tr. 1, 4:12–18; Ex's. T12-14.

48. In 2010, LXEng recognized revenue in excess of $4 million and had received a payment of $6 million from one of its contracts.  At the same time, LXEng still had a $3 million receivable, and it had access to a $2.9 million legal reserve fund. Tr. 2, 0:51–54.

49. PenServ offered options to LXEng relating to the alleged adverse business conditions other than freezing the Plan benefits and participation, but left the final decision of whether to freeze the Plan to LXEng's discretion. Tr. 1, 1:02.

50. Mr. Xiao signed the 2010 Amendment on behalf of LXEng, as the Employer and Administrator of the Plan, and, with Ms. Chen, as co-trustee. Jt. Stip. Facts, ¶25.

51. As of January 1, 2010, Mr. Xiao and Ms. Chen were still listed as the only two participants in the Plan.  Jt. Stip. Facts, ¶26.

52. Several of LXEng's employees, including Joe Garcia, Kevin Corkwell, Robert Brown, and Thomas Barker, would have been participants in the Plan by 2010 or 2011 if not for the 2009 and 2010 Amendments. Tr. 1, 2:31–33; Ex. T9, at p. 5 (Employee Census).

53. The timing of the 2009 Amendment and 2010 Amendment was designed to prevent anyone other than Mr. Xiao or Ms. Chen from becoming participants in the Plan or deriving any benefits from the Plan. Tr. 1, 2:42–43.

10

## The Mandatory Amendments

54. PenServ advised LXEng and Mr. Xiao on January 26, 2009 that it was necessary to amend the Plan pursuant to IRC requirements. Tr. 1, 0:40–41; Ex. T17.

55. PenServ prepared the necessary amendments for LXEng and provided the instructions for executing the said amendments. Tr. 1, 0:41–42; Ex. T17. PenServ was not aware whether LXEng ever executed the January 26, 2009 amendments because an executed copy was never provided to PenServ by LXEng. Tr. 1, 0:43.

56. PenServ advised LXEng and Mr. Xiao on December 4, 2009 that it was necessary to amend the Plan pursuant to Pension Protection Act of 2006 and the Heroes Earnings Assistance and Relief Tax Act of 2008. Tr. 1, 0:43–44; Ex. T18.

57. PenServ prepared the necessary amendments for LXEng and provided the instructions for executing the said amendments. Tr. 1, 0:44; Ex. T18. PenServ was not aware whether LXEng ever executed the December 4, 2009 amendments because an executed copy was never provided to PenServ by LXEng. Tr. 1, 0:44–45.

58. Mr. Ostuni spoke with Mr. Xiao by telephone about the necessary amendments and requested executed copies of the amendments. Tr. 1, 0:45.

59. As of December 31, 2009, Mr. Xiao and Ms. Chen were still listed as the only two participants in the Plan, and were listed as "highly compensated employees." Jt. Stip. Facts, ¶¶ 22, 23.

60. For the calendar year 2009, LXEng reported ordinary business income of $989,384 to the IRS. Ex. T13.

61. On October 29, 2010, PenServ sent a letter to LXEng and Mr. Xiao informing them that the Plan needed to be amended and restated pursuant to the Economic Growth and Tax Relief

Reconciliation Act ("EGTRRA"). Tr. 1, 46-47; Ex. T19. The Plan was amended and restated

as of December 15, 2011 to comply with EGTRRA. Tr. 1, 2:59-3:00; Ex. T2.

62. The EGTRRA restatement of the Plan did not have any effect on the applicability of the 2009

Amendment, the 2010 Amendment, or the termination of the Plan. Tr. 1, 3:00.

## **LXEng Fully Funds the Plan**

63. In September 2010, after the 2010 Amendment, LXEng deposited $38,849 into the Plan to

fully fund the Plan for the calendar year 2009, the last year before the Plan was frozen. Tr. 1,

1:04-07; Ex. T20. At the time, the minimum funding requirement was $23,058. Tr. 1, 1:07.

64. LXEng had already met its minimum funding requirement for the calendar year 2009 and,

thus, there was no obligation to deposit the additional $38,849 into the Plan. Tr. 1, 1:36; Ex.

T20.

65. Mr. Xiao authorized the $38,849 payment in a conversation with Mr. Cazes. Tr. 2, 0:39–40;

Ex. T20.

## **Termination of the Plan**

66. LXEng terminated the Plan effective January 15, 2011, by a resolution dated January 1,

2011. Jt. Stip. Facts, ¶27.

67. Mr. Xiao signed the resolution as the "Principal" of LXEng and solely acknowledged receipt

of the resolution on behalf of the Plan as co-trustee.  Jt. Stip. Facts, ¶28.

68. Mr. Xiao and Ms. Chen were the only participants in the Plan at the time it was terminated.

Tr. 1, 2:25.

69. The Plan was only in operation for approximately four years. Tr. 1, 2:25–26.

70. After the Plan was terminated, PenServ advised Mr. Caputo of the requirements for winding

down the Plan and distributing the assets.  To date, these actions have not been taken. Tr. 1,

1:10.

### Divorce and Transfer of Ms. Chen's Interest in the Plan

71. On June 12, 2013, Ms. Chen filed a Complaint for Divorce in the Superior Court of New

Jersey, Chancery Division, Family Part of Morris County ("Divorce Action"). Jt. Stip. Facts,

¶29.

72. On July 3, 2013, a Judgment of Divorce was entered between Mr. Xiao and Ms. Chen in the

Divorce Action. Jt. Stip. Facts, ¶30.

73. As a result of the Judgment of Divorce, Ms. Chen relinquished her 10% ownership of LXEng

to Mr. Xiao, as well as her interest in the Plan. Jt. Stip. Facts, ¶31.

### Bankruptcy Filing and Claim of Exemption

74. On July 30, 2013, the Petition Date, Mr. Xiao filed for voluntary bankruptcy relief under

Chapter 7 of the Bankruptcy Code. Jt. Stip. Facts, ¶33. As of the Petition Date, Mr. Xiao was

the sole participant and the sole beneficiary of the Plan. Tr. 1, 2:06, 2:51, 3:23.

75. As of December 31, 2013, the Plan had $471,951.00 in a brokerage account at Summit

Equities, Inc. Jt. Stip. Facts, ¶32.

76. On August 7, 2013, Mr. Xiao filed Schedules A-J to supplement his bankruptcy petition.  In

Schedule C, he claimed an exemption to the entirety of the Plan's assets pursuant to 11

U.S.C. § 522(d)(10)(E) (ECF No. 12). On November 20, 2014, the Trustee filed an objection

to Mr. Xiao's claim of exemption (ECF No. 270).

77. On March 20, 2017, Mr. Xiao amended his claim of exemption in the Plan to one under 11

U.S.C. § 522(d)(12) (ECF No. 458). On March 29, 2017, the Trustee filed an objection to

Mr. Xiao's amended claim of exemption (ECF No. 475).

78. On November 15, 2016, the Trustee filed a Motion for a Stand-Still Order Regarding the

Plan Assets (ECF No. 413), to which the Debtor objected (ECF No. 415). The Court issued a

Memorandum of Decision granting the Trustee's Motion for Stand-Still Order on December

1, 2016 (ECF No. 423). That decision directed that the Debtor neither interfere with nor

dissipate the Plan's assets during the pendency of this case.

V.    CONCLUSIONS OF LAW

A. Applicable Law

Pursuant to Section 522(d)(12), a debtor may exempt "[r]etirement funds to the extent

that those funds are in a fund or account that is exempt from taxation under section 401, 403,

408, 408A, 414, 457, or 501(a) of the IRC."[4] 11 U.S.C. § 522(d)(12).[5] There are alternative tests

for making this determination. First, if a plan has received a favorable determination under I.R.C.

Section 7805 and the determination is in effect as of the petition date, a plan will be presumed to

be exempt. 11 U.S.C. § 522(b)(4)(A). If there has been no favorable determination, the debtor

must demonstrate either: (1) that no prior determination to the contrary has been made by a court

or the IRS; and (2) that the plan is in substantial compliance with the applicable requirements of

the I.R.C., or that the debtor is not materially responsible for any failure to be in substantial

compliance. 11 U.S.C. § 522(b)(4)(B).

---

[4] These sections of the Internal Revenue Code deal with pension, profit sharing, and stock bonus plans; employee annuities; individual retirement accounts; deferred compensation plans of state, local government, and tax-exempt organizations; and certain trusts. Alan N. Resnick & Henry J. Sommer, 4 Collier on Bankruptcy ¶522.09[12] (16th ed. 2015).
[5] Section 522(b)(3)(C) includes identical language allowing debtors in states that have opted out of the federal exemptions scheme to also claim as exempt "retirement funds." 11 U.S.C. § 522(b)(3)(C).

B.   There is no Presumption of Exemption Under Section 522(b)(4)(A)

Section 522(b)(4)(A) provides that if the retirement fund has received a favorable

determination, and that determination is in effect as of the petition date, those funds shall be

presumed to be exempt from the bankruptcy estate. The Debtor here claims that the IRS letters

issued in 2002 and 2010 are favorable determinations that entitle the Plan to a presumption of

exemption. Exs. T1, T3. However, the determination letters merely found the *form* of the plan

acceptable. *Id.* "[This] opinion relates only to the acceptability of the form of the plan under the

Internal Revenue Code." *Id*. The letters specifically state that they are "not a ruling or

determination as to whether an employer's plan qualifies under Code Section 401(a)[,]" and that

the terms of the Plan "must be followed in operation."[6] *Id*. For this reason, a number of courts

have not given presumptive effect to such letters under Section 522(b)(4)(A). *See RES-GA*

*Dawson, LLC v. Rogers (In re Rogers)*, 538 B.R. 158, 173 (Bankr. N.D. Ga. 2015) ("[A]

favorable opinion letter as to the form of a prototype plan by itself is not a sufficient 'favorable

determination' for purposes of § 522(b)(4)(A)."); *In re Bauman*, 2014 WL 816407, at *14

(Bankr. N.D. Ill. 2014) ("A letter of this kind, addressing only 'form' and not 'operation' does

not raise the presumption under section 522(b)(4)(A).") (citing *Agin v. Daniels (In re Daniels)*,

452 B.R. 335, 347 (Bankr. D. Mass. 2011), *aff'd on other grounds*, 482 B.R. 1 (D. Mass. 2012),

*aff'd sub nom Daniels v. Agin*, 736 F.3d 70 (1st Cir. 2013).

Furthermore, the Plan was submitted for form approval to the IRS on January 31, 2008,

after the time that both discretionary amendments were made. Mr. Fair conceded that once

---

[6] The letters also state that an employer that adopts the form plan may rely on the letter with respect to the
qualification of its particular plan in certain circumstances and cites Rev. Proc. 2005-16, which includes provisions
delineating the circumstances in which an employer can rely on an opinion letter governing a volume submitter form
plan as applying also to the employer's specific plan. *See* Rev. Proc. 2005-16, § 19.02. The letter further states that
the opinion applies with respect to IRC Section 401(a)(26) if 100% of all nonexcludable employees benefit under
the plan. In these cases, the opinion letter is the equivalent of a favorable determination letter. *Id*. at § 19.04.
However, these provisions do not apply to this case, and the Court heard no evidence asserting otherwise.

changes are made to a plan, such as the discretionary amendments LXEng made here, the plan is no longer protected by such determination letters. Tr. 2, 2:41. Accordingly, there is no presumption that the Plan is exempt under Section 522(b)(4)(A), and Debtor's contentions to the contrary are misleading and without merit.

C.   The Plan is Not in Substantial Compliance with the IRC

Under Section 522(b)(4)(B), if there is no effective determination concerning the plan, the debtor must show, as one alternative, that no contrary ruling was made by the IRS or a court, and that the plan was in substantial compliance with the requirements of the IRC.

Here, there was no prior determination to the contrary made by a court or the IRS. The evidence presented at trial, however, overwhelmingly supports that the Plan was not in substantial compliance with the IRC. The evidence showed that the Plan fatally deviated from a number of IRC requirements: (1) that it be a permanent plan; (2) the minimum participation requirements under IRC Section 401(a)(26) and related regulations; (3) the exclusive benefit requirements and nondiscrimination requirements under IRC §§ 401 (a)(2) and (a)(4), respectively; and (4) the requirement that the Plan be operated in accordance with its terms. Tr. 1, 2:27–49, 3:26–28; Tr. 2, 2:07; Exs. T1, T9, T32, T33. The cumulative effect of these deviations convinces this Court that the Plan was not in substantial compliance with the IRC.

**i.   The Plan Violated the Permanency Requirement**

As a condition for its qualification, a plan must be established with the goal of being a permanent, rather than a temporary, program. Therefore, although an employer may reserve the right to amend or terminate a plan, the abandonment of a plan for any reason other than business necessity within a few years after it has taken effect will be evidence that the plan, from its inception, was not a bona fide program for the exclusive benefit of employees in general. *See* 26

16

C.F.R. § 1.401-l(b)(2). As Mr. Galiette testified, the violation of the permanency requirement is determined by a facts and circumstances test, and valid business reasons justifying the termination of a plan within ten years include adverse business conditions, the liquidation of an employer, or the dissolution of an employer. Tr. 2, 2:45–2:46.

In weighing the totality of the facts and circumstances in this case, as well as Mr. Xiao's lack of credibility, the weight of the evidence shows that the Plan was not established with the goal of being a permanent plan for the benefit of employees. Mr. Galiette credibly testified that based on his expert opinion, the Plan was terminated only shortly after it was initiated, at a time when only the owners of LXEng were participants and beneficiaries, while the Plan was fully funded, and when the Plan sponsor faced no adverse business conditions. Tr. 1, 2:01–03; Tr. 1, 2:26–27.

Mr. Fair, the Debtor's expert, unconvincingly testified that the Plan was terminated because LXEng faced prospective adverse business conditions. In delivering his expert opinion, however, it became clear that Mr. Fair relied exclusively on the deposition testimony of Mr. Xiao and Mr. Ostuni in opining that a valid business reason existed to terminate the Plan. Tr. 2, 2:46–47. He neither reviewed LXEng's tax returns for the years 2007–2010, nor was he aware that in 2010, LXEng recognized revenue in excess of $4 million, and had received a payment of $6 million from one of its contracts. Tr. 2, 2:48–50. He was also unaware of the fact that in the same year, LXEng still had a $3 million receivable and access to a $2.9 million legal reserve fund. Tr. 2, 2:50–51. Accordingly, the Court gives little weight to the uninformed opinion of Mr. Fair in his assessment of this issue. This Court also finds that, given the Debtor's income at the time the Plan was terminated, it was not facing adverse business conditions. The Debtor provided no other explanation for why the Plan could justifiably be terminated. As Mr. Galiette testified,

17

violation of the permanency requirement would, by itself, be enough to disqualify the Plan under

the IRC. Tr. 1, 2:26. Accordingly, this Court finds that, based on the totality of the facts and

circumstances in this case, the Plan violated the permanency requirement of the IRC.

### ii.    The Plan Violated the Minimum Participation Requirements

IRC Section 401(a)(26) provides that in order for a trust to constitute a qualified trust,

the trust must be part of a plan which, on each day of the plan year, benefits the lesser of (1) fifty

employees of the employer; or (2) the greater of 40% of the employees of the employer or two

employees (or if there is only one employee, such employee). *See also* 26 C.F.R. § 1.401(a)(26)-

2(a).

Here, this Court finds that the Plan also violated the minimum participation requirement.

As is evidenced by the Employee Census, the Plan did not benefit at least fifty employees, or the

greater of 40% or two employees of LXEng, at any point during its existence. Ex. T9. Mr.

Galiette testified that as of January 1, 2010, six employees would have satisfied the Plan

eligibility requirements, meaning that there should have been at least three employees benefiting

under the Plan. Tr. 1, 2:27–32. The only two employees benefiting under the Plan, however,

were Mr. Xiao and Ms. Chen. Similarly, in 2011, ten employees would have been eligible to

participate, meaning that at least four were required to benefit under the Plan. The only

employees who benefited under the Plan in 2011 were Mr. Xiao and Ms. Chen. This testimony

was not rebutted.

Furthermore, the trial testimony established that none of the exceptions to the minimum

participation rule apply in this case because: (1) the Plan benefited highly compensated

employees; (2) the Plan was not a collectively bargained multiemployer plan; (3) the Plan was

not a frozen underfunded plan subject to the requirements of the Employee Retirement Income

Security Act of 1974 (hereinafter "ERISA"); (4) the Plan was "top-heavy";[7] (5) the Plan was not a 401(k) plan maintained by a governmental or tax-exempt entity; (6) and the Plan was not acquired by a second company through a merger or acquisition. Tr. 1, 2:33–36. Therefore, this Court finds that the Plan violated the minimum participation rule which, alone—according to both parties' experts—would be enough to disqualify the Plan. Tr. 1, 2:38; Tr. 2, 2:07.

### iii.     The Plan Violated the Nondiscrimination and Exclusive Benefit Requirement

IRC Section 401(a)(4) prohibits a plan from discriminating in favor of a subset of highly compensated employees by providing that a plan will be qualified only "if the contributions or benefits provided under the plan do not discriminate in favor of highly compensated employees." 26 C.F.R. § 1.401(a)(4). The Department of Treasury Regulation provides:

> If the plan is so designed as to amount to a subterfuge for the distribution of profits to shareholders, it will not qualify as a plan for the exclusive benefit of employees . . . . [A] plan is not for the exclusive benefit of employees in general if, by any device whatever, it discriminates either in eligibility requirements, contributions or benefits in favor of employees who are officers, shareholders . . . or the highly compensated employees.

26 C.F.R. § 1.401-1(b)(3). Therefore, in order to satisfy the requirements of IRC Section 401(a)(4), the timing of plan amendments may not have the effect of discriminating significantly in favor of highly compensated employees. *See* 26 C.F.R. § l.40l(a)(4)-l(b)(4). For this purpose, a plan amendment includes the establishment or termination of a plan and any change in the benefits, rights, features, or benefit formulas of the plan. Whether the timing of a plan amendment or series of plan amendments has the effect of discriminating significantly in favor of highly compensated employees is based on all of the relevant facts and circumstances. *See* 26 C.F.R. §§ l.401(a)(4)-5(a)(1), (2). In determining whether a plan complies with the requirements

---

[7] According to Mr. Galiette's testimony, "top-heavy" means that the only beneficiaries of the Plan are "key employees," and both Mr. Xiao and Ms. Chen were key employees of LXEng.  Tr. 1, at 2:34.

of IRC Section 401(a), the law looks not only to the form of the plan, but also to its operation. 26 C.F.R. § 1.401-l(b)(3); *see also Plunk v. Yaquinto (In re Plunk),* 481 F.3d 302, 307 (5th Cir. 2007).

Here, the evidence shows that the Plan violated the anti-discrimination requirement of IRC Section 401(a)(4) and the exclusive benefit rule of IRC Section 401(a)(2). Mr. Galiette credibly testified that the adoption of the 2009 Amendment and 2010 Amendment and the timing of the termination of the Plan collectively excluded from participation or the accrual of benefits any employees of LXEng other than Mr. Xiao and Ms. Chen, who were highly compensated employees. First, Mr. Xiao increased the eligibility period in 2009 to exclude employees whom he had hired in or after 2008 and accelerated his and Ms. Chen's vesting of the accrued benefits to 100%. Next, Mr. Xiao froze the Plan to new participants, effective as of January 1, 2010, on the eve of when several of LXEng's employees would have become eligible to participate in the Plan under the two-year eligibility period.

Additionally, the timing of the $38,849.00 payment into the Plan supports the inference that the Plan was only ever intended to benefit Mr. Xiao and Ms. Chen. Mr. Xiao had no obligation to deposit this amount into the Plan since the minimum funding had already been met for the calendar year 2009. The effect was to segregate funds for the sole benefit of Mr. Xiao and Ms. Chen, while freezing out all other employees. Tr. 1, 3:26–28. As Mr. Galiette testified, violation of either the anti-discrimination requirement or exclusive benefit rules would, alone, be enough to disqualify the Plan under the IRC.  Tr. 1, 2:43. Accordingly, this Court finds that the Plan violated the anti-discrimination and exclusive benefit requirements.

### iv.    The Plan Was Not Operated in Accordance With its Terms

In order to be qualified, a plan must be operated in accordance with a definite written program. *See* 26 C.F.R. § 1.401-l(a)(2). The failure to operate a plan in accordance with its terms constitutes an operational defect that adversely affects the qualification of the plan. *See* Rev. Proc. 2013-12, § 5.01(2)(b) (definition of Operational Failure).

Mr. Galiette testified that the Plan was not operating in accordance with its terms because it purchased life insurance policies. Tr. 1, 2:43–45; T1, at ¶¶ 17, 33. Mr. Fair, however, sufficiently rebutted that testimony by his opinion that the mere purchase of a life insurance policy, which is akin to making an investment, is not a disqualifying act.

Mr. Galiette also testified, however, that according to the Plan, no prior service with another company was to be recognized in the calculation of benefits. Despite that provision, the Plan credited Mr. Xiao and Ms. Chen's alleged service with Keystone in order to qualify them for benefits under the Plan. In Mr. Galiette's opinion, the Plan should not have recognized either Mr. Xiao's or Ms. Chen's pre-participation service with Keystone because no merger occurred between LXEng and Keystone, nor were LXEng and Keystone engaged in the same line of work. Tr. 1, 2:46–48. When asked about Keystone's relationship to LXEng, Keystone's business operations generally, and about Ms. Chen's involvement with Keystone, Mr. Xiao's responses were oblique and evasive, and this Court accords such testimony little to no weight. Mr. Galiette's testimony was competent, credible, and not sufficiently rebutted by Mr. Fair or Mr. Xiao. Accordingly, this Court concludes that the Plan was not operated in accordance with its terms, which by itself, as Mr. Galiette credibly testified, would be enough to disqualify the Plan under the IRC. Tr. 1, 2:48–49.

D.  The Debtor is Materially Responsible for the Plan's Substantial Compliance Failure

Having found that the Plan is not in compliance with the IRC, the Court turns to the final

prong of this inquiry. Section 522(b)(4)(B)(ii)(II) provides that even if a plan is not in substantial

compliance, Mr. Xiao's interest in the funds may still be exempt if he demonstrates that he is not

materially responsible for that failure. Mr. Xiao bears the burden of proof to show that he was

not materially responsible. *See In re Sharkey*, 563 B.R. 655, 666 (Bankr. E.D. Mich. 2017).

Mr. Xiao has not met his burden to show that he was not materially responsible for the

Plan's substantial non-compliance with IRC Section 401. Not only has Mr. Xiao failed to present

any credible evidence that he was not materially responsible for the qualification failures, but the

overwhelming evidence shows that he was singularly responsible for such failures. It is

undisputed that, from the Plan's formation to the Petition Date, Mr. Xiao was in sole control of

LXEng, which he described as a "one man company." Tr. 2, 0:12–13. Since the time of Mr.

Little's death, Mr. Xiao admitted that he was the CEO, COO, and managing member of LXEng.

LXEng was the Plan Administrator. In addition, it was undisputed that Mr. Xiao was also the co-

trustee of the Plan with Ms. Chen and signed each and every document creating, amending, and

terminating the Plan as the principal of LXEng and co-trustee of the Plan. As was made patently

clear during Mr. Galiette's testimony, "the Plan Administrator and the Plan sponsor are

ultimately responsible for the Plan's failure to comply with the applicable IRC provisions,

ERISA, and its own terms." Tr. 1, 3:15–16. This key testimony went unrebutted.

Mr. Xiao has instead blamed the Plan's lack of qualification on PenServ, the Plan's third

party administrator, and certain other professionals. Such an argument is not supported by the

facts of this case. As Mr. Galiette testified, a third-party administrator is a service provider that

the Plan Administrator retains to perform specific functions with no discretionary authority,

unless it has specifically agreed to undertake fiduciary responsibility, which PenServ did not do in connection with the Plan. Tr. 1, 1:52, 3:19–20. Mr. Ostuni, the president of PenServ, was clear in his testimony that PenServ "was unable to take any actions regarding the Plan without direction from LXEng as the Administrator, Mr. Xiao as the owner of LXEng, or LXEng's advisors and agents Mr. Cazes and Mr. Caputo." Tr. 1, 0:38–39. PenServ had no discretionary authority over the Plan, and could not make amendments, change its terms of participation, change the Plan Administrator or trustees, or terminate it. Only Mr. Xiao, acting through LXEng could do these things. Indeed, Mr. Ostuni testified that PenServ's role was to provide options to LXEng, but it was solely LXEng's decision of which option to choose. *See* ECF No. 538, at ¶81. He further testified that PenServ, on its own initiative, would never have advised LXEng or any other client to adopt anything similar to the 2009 Amendment. *Id.* at ¶55. That testimony also went unrebutted. Mr. Xiao's own expert clearly indicated, "a person is not exonerated from material responsibility for his elections and decisions by delegating administration to third parties." Tr. 2, 2:30–31.

Regarding the other professionals, namely, Mr. Caputo and Mr. Cazes, there was no evidence that they could have been materially responsible for the Plan's lack of compliance with the IRC. Mr. Cazes is a certified public accountant and Mr. Caputo is a certified financial planner. Although the Debtor conceded that the two were agents of LXEng, he did not present any evidence showing that these individuals had any decision-making power over the Plan.

As Mr. Xiao actively managed, supervised, and decided the affairs of the Plan as employer, manager, and co-trustee, he is materially responsible for its failure to comply with the pertinent sections of the IRC.

VI.    CONCLUSION AND ORDER[8]

By all accounts, the Plan failures at issue in this case do not merely constitute technical

defaults, but instead are operational failures that "are substantial violations of the core

qualification requirements for a retirement" plan as set forth in the IRC. *See* IRC Section

401(a)(2). Given the timing of the 2009 and 2010 Amendments, and the subsequent freezing of

the Plan, it appears that LXEng operated the Plan in order to solely benefit Mr. Xiao and his then

spouse, Ms. Chen. According to the Treasury Regulations, a plan cannot act as a subterfuge for

the distribution of profits to the owners of the employer. 26 C.F.R. § 1.401-1(b)(3). It appears to

have been so here. Ex. T33, at p. 4.

The Debtor has persistently argued that because the IRC allows for the correction of plan

defaults, LXEng could, at any time, make the necessary corrections. Indeed, both experts

supported the position that the IRS has correction programs that allow for the remediation or

correction of even disqualifying plan errors within a certain time-frame. However, it is clear

from the record here that the Debtor failed to take a single corrective measure from the Petition

Date to the time of trial, despite ostensibly having the opportunity to do so. Furthermore, as Mr.

Galiette testified, the correction of operational failures would presumably require LXEng to pay

fines to the IRS and provide benefits to some or all of the Debtor's former employees. Both

LXEng and Mr. Xiao are in the midst of Chapter 7 bankruptcies, and have demonstrated

insufficient financial abilities to fund any corrections to which they might otherwise have had

access. The corrective action arguments are impracticable, futile, and unavailing.

---

[8] In his opposition to the Trustee's Motion for Summary Judgment, the Debtor initially advanced the argument that the Plan was subject to ERISA, and therefore exempt. However, the Debtor has seemingly abandoned this argument. The Debtor conceded in his Post Trial Brief, as did Mr. Fair at trial, that the Plan is not subject to ERISA. Therefore, the Court need not reach that issue. *See* ECF No. 54; Tr. 2, 2:12–13.

Finally, it is well-established law that a debtor's rights in a claimed exemption are established on the petition date. *See William J. Pasquina, P.C. v. Cunningham (In re Cunningham)*, 354 B.R. 547, 553 (D. Mass. 2006) ("It is hornbook bankruptcy law that a debtor's exemptions are determined as of the time of the filing of his petition. This means [that] the Court must focus only on the law and *facts* as they exist *on the date of filing the petition*.") (internal quotation marks and citations omitted), *aff'd*, 513 F.3d 318 (1st Cir. 2008); *Cisneros v. Kim (In re Kim)*, 257 B.R. 680, 687 (B.A.P. 9th Cir. 2000) ("[B]ankruptcy law is clear that debtor's exemption rights are fixed as of the petition date[.]") (citing *White v. Stump*, 266 U.S. 310 (1924)), *aff'd*, 35 F. App'x 592 (9th Cir. 2002).

Accordingly, the referenced funds under the LXEng Pension Plan, in the amount of $412,533.40, plus any interest or dividend accruals thereon,[9] are not exempted from the Debtor's bankruptcy estate.[10] The Trustee's Objection is SUSTAINED.

IT IS SO ORDERED at Hartford, Connecticut this 22nd day of August 2018.

*James J. Tancredi*
*United States Bankruptcy Judge*
*District of Connecticut*

---

[9] According to a Pension Report dated July 12, 2018 that was filed by Debtor's Counsel, the value of the Plan as of May 31, 2018 was $602,761.17 (ECF No. 554).
[10] In light of the Court's ruling, it need not reach the issue of whether the IRS would consider the Plan failures in this case to be "egregious."